

U.S. Department of Justice

United States Attorney
Eastern District of New York

VAZ  
F. #2018R00788

271 Cadman Plaza East  
Brooklyn, New York 11201

June 7, 2025

By ECF

The Honorable Vera M. Scanlon  
United States Magistrate Judge  
United States District Court  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, New York 11201

      Re:    United States v. Romeo Gonzales  
            Criminal Docket No. 20-239 (S-8) (BMC)

Dear Judge Scanlon:

      The government respectfully submits this letter in anticipation of the initial appearance and arraignment for defendant Romeo Gonzales, also known as "Romeo Gonzalez" and "Derek Miller," currently scheduled for this morning at 11:30 a.m. For the reasons set forth below, the government respectfully seeks a detention hearing under 18 U.S.C. § 3142(f)(1)(C) and (f)(2)(A) and the entry of a permanent order of detention.

      I.    Background

      The defendant is the fifty-third and final defendant to be arrested in connection with this longstanding racketeering case. He has been fugitive since 2020. All of his co-defendants have been convicted of crimes related to the Bully Gang, a violent street gang operating out of the Bedford-Stuyvesant neighborhood of Brooklyn and elsewhere. Five of the defendants have been convicted in two separate jury trials. The defendant faces three narcotics charges in connection with the Bully Gang's massive drug trafficking operation.

      The evidence offered at the two trials provides ample explanation of the defendant's drug trafficking.

      The investigation was conducted by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and the New York City Police Department ("NYPD") Joint

1

Firearms Task Force.  Various investigative techniques were used, including review of location data in connection with phones used by the co-conspirators, review of cellular telephone data and social media accounts including messages between co-conspirators, review of vehicle records, and review of surveillance camera footage.  Investigators also extensively reviewed historical law enforcement materials and spoke at length to members of the charged conspiracies, some of whom are now cooperating witnesses.  The defendant was identified as a member of the interstate drug trafficking organization, distributing crack cocaine, heroin, and other narcotics along the East Coast, including in Maine, New Jersey, and New York.  In addition to the drug trafficking, his co-conspirators were also involved in firearms trafficking along the East Coast, including in Maine, New Jersey, and New York.  The drug trafficking organization operated as far back as 2015.

"Stash house" and "trap house" are colloquial terms for a premises maintained for the purposes of manufacturing, storing, and/or distributing narcotics.  The Bully Gang recruited Brooklyn-based drug dealers, often members and associates of the Bully Gang, to travel to Maine, often by bus and rideshare, and to sell crack cocaine and heroin out of the stash houses.  The dealer was sent to Maine for weeks or months at a time and called a "sitter."  Individuals called "runners" would drive drugs to Maine and often bring drug proceeds back to the New York area.

The Bully Gang used multiple stash houses in, among other locations, Maine and New Jersey to store and sell drugs.  The stash houses were placed throughout Maine and changed from time to time to evade law enforcement scrutiny.  Relevant here, the stash houses included a house a 9 Bings Boulevard in Swanville, Maine (the "9 Bings Stash House")—one of the stash houses personally managed by Bully Gang member Bermon Clarke.  The narcotics were typically stored in a fridge there:

 

The stash houses were often assigned a designated cellular telephone for assigned drug dealers to use to conduct drug transactions and communicate with co-conspirators.  These "trap phones" were replaced and recirculated frequently.  As the drugs ran low, members of the Bully Gang arranged to bring more drugs to "re-up" the stash houses.

Large quantities of crack cocaine and heroin were distributed from each of the stash houses:  Witness testimony demonstrated that each house would get about 200 grams of

2

crack cocaine and heroin each for every re-up.  The testimony was extensively corroborated by hundreds of pages of cell phone evidence that discussed drugs and money, including messages that referenced quantities of crack cocaine (often referred to as "up" or "u") and heroin ("down" or "d").  Heroin recovered by law enforcement in connection with the investigation was laced with fentanyl.

The lucrative nature of the trips was clear to all participants.  Sitters often would drive back with literal stacks of cash.  Photographs of such currency (held in the hand of co-defendant Demetrius Johnson after three separate trips) are below:



And below is a photograph of drug proceeds obtained by gang leader and co-defendant Franklin Gillespie after one of the drug trips:



On June 25, 2020, law enforcement agents executed multiple arrest and search warrants, including at four stash houses in Maine and one stash house in New Jersey, in connection with the investigation.  During the execution of those search warrants, agents discovered and seized evidence of the conspiracy, including large quantities of drugs, narcotics packaging paraphernalia, surveillance detection equipment, hundreds of thousands of dollars in cash, and assorted firearms and ammunition.

Consistent with the pattern of the charged drug trafficking conspiracy, Gonzales traveled from New York to operate the 9 Bings Stash House. He had been in Maine for weeks during that trip. Phone messages at the time showed that the thousands of dollars of narcotics were sold every day at the house. Gonzales was serving as a sitter at the 9 Bings Stash House on June 25, 2020, when law enforcement executed the search there and discovered more than 90.1 grams of crack cocaine, 39.1 grams of a heroin/fentanyl mixture, at least three drug ledgers, drug packaging paraphernalia, drug scales, a Glock 23 .40-caliber pistol with a magazine (found in the living room), assorted ammunition (found in the living room and a bedroom), and a number of cellphones:

  

The defendant spoke with law enforcement searching the premises that day. Three other scheme participants were in the house at the time. The defendant identified himself with the name "Romeo Gonzales," even though identification cards on him at the time identified him as "Romeo Gonzalez." The defendant did not provide a consistent story about why he was in Maine, how he got to Maine, or how he knew the others in the house. The defendant lied and said he was working as a mechanic in the house.

Law enforcement obtained at least one cellphone the defendant was using at the time. (The defendant's use is corroborated, by other things, links between the device and an e-mail account bearing the defendant's name.) Among the scheme-related content on the phone was a June 2, 2020 message in which the defendant said he had $11,000 in hand ("11 bands") and a photograph showing the defendant appearing to carry the above-displayed firearm while being a sitter in the stash house. (Indeed, location data associated with the photograph confirm that it was taken in or about the house.) The defendant created the photograph on the night of June 24, 2020 (the night before the above-described law enforcement search):

4



On October 14, 2020, a grand jury returned a Second Superseding Indictment under seal charging the defendant with three narcotics offenses: narcotics trafficking conspiracy, maintenance of the 9 Bings stash house, and substantive narcotics distribution. An arrest warrant was issued in connection with the Second Superseding Indictment that day.

On October 21, 2020, law enforcement attempted to execute the arrest warrant and attempted to locate him at his residence at the time in New York (where his mother lived) and at two locations in Brooklyn. The Second Superseding Indictment was unsealed as to a defendant that day. (See ECF No. 92.) Phone and e-mail records show that, after the attempted arrest, the defendant appeared to stop using his known primary phone number and e-mail account at the time—consistent with the defendant finding out about the case.

On September 14, 2022, a grand jury returned the most recent operative charging instrument—an Eighth Superseding Indictment charging the defendant with narcotics-related offenses numbered as Counts Two, Twenty-Eight and Thirty-Three.

On June 5, 2025, the NYPD arrested the defendant for trying to sell crack cocaine—one of the drugs he sold during the Bully Gang drug trafficking scheme—down the street from a preschool to an undercover detective in the Bronx. At this point, the defendant was using the alias "Derek Miller" and provided to the NYPD a fake date of birth.

II.     Legal Standard

At the government's request and "immediately upon the person's first appearance," this Court "shall hold" an adversarial detention hearing in any "case that involves," among other things, a Controlled Substances Act "offense for which a maximum term of imprisonment of ten years or more" or "a serious risk that such person will flee." 18 U.S.C. § 3142(f)(1)(A), (2)(A). The Federal Rules of Evidence do not apply, and the government may proceed by proffer. See id. § 3142(f); United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000). Detention hearings are "typically informal affairs, not substitutes for trial and discovery." United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004) (quoting United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.)).

During the hearing, the Court must "determine whether any condition or combination of conditions" of release "will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f). If no condition or conditions exist to reasonably protect against the defendant's flight risk and dangerousness, then the Court "shall order the detention of the person before trial," id. § 3142(e)(1), and issue "written findings of fact and a written statement of the reasons for the detention," id. § 3142(i)(1). In making the determination, the Court "shall . . . take into account the available information concerning" (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves . . . a controlled substance"; (2) "the weight of evidence against the person"; (3) "the history and characteristics of the person," including "the person's character, . . . length of residence in the community, community ties, [and] past conduct"; and (4) "the nature and seriousness of the danger to any person or the community." Id. § 3142(g).

Dangerousness encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and other witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (citation omitted). This Court must find the facts supporting a finding of dangerousness by clear and convincing evidence. See id. § 3412(f); United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995). Dangerousness under the Bail Reform Act also includes "the harm to society caused by narcotics trafficking." United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985).

Meanwhile, factors relevant to flight risk include the strength of the evidence and the possibility of a severe sentence, both of which provide a considerable incentive to avoid judicial proceedings. See, e.g., Millan, 4 F.3d at 1046; United States v. Jackson, 823 F.2d 4, 7 (2d Cir. 1987); United States v. Martir, 782 F.2d 1141, 1147 (2d Cir. 1986). The Court must find the facts supporting a finding of flight risk by only a preponderance of the evidence. See United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001).

Finally, because he is charged with participating in a cocaine, heroin, and fentanyl distribution conspiracy, the defendant here is presumed to pose both a danger to the

6

community and a risk of flight, and there is a presumption that "no condition or combination of conditions will reasonably assure the appearance of the [defendant] and the safety of the community." 18 U.S.C. § 3142(e)(3)(A); see also Harmelin v. Michigan, 501 U.S. 957 (1991) 1002-03 (Kennedy, J., concurring) (observing that the characterization of drug possession with intent to distribute as "nonviolent and victimless [crime] is false to the point of absurdity" given "pernicious effects" of drug use). The indictment alone "conclusively establishes the existence of probable cause for the purpose of triggering" the presumption. United States v. Contreras, 776 F.2d 51, 55 (2d Cir. 1985). Even if the defendant "come[s] forward with evidence that he does not pose a danger to the community or a risk of flight," the presumption "remains a factor to be considered" in the totality of circumstances. United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001).

### III. Argument

This Court should issue a permanent order of detention as to the defendant because no set of conditions will reasonably assure his appearance at judicial proceedings and the safety of other persons and the community. See 18 U.S.C. § 3142(e)(1). The defendant's substantial period of fugitivity and his return to selling narcotics both show that he poses a danger to the community and risk of flight.

The defendant's participation in a highly lucrative and violent[1] drug trafficking organization—an organized that sold dangerous crack cocaine and deadly fentanyl-laced heroin—reflects his serious harm to the community. See Leon, 766 F.2d at 81; see also 18 U.S.C. § 3142(g)(1) (finding relevant "whether the offense . . . involves . . . a controlled substance"). In particular, the defendant's carrying and use of a firearm in connection with the drug trafficking reflects the seriousness of his conduct. Such conduct, if separately charged, would constitute a crime of violence, which weighs in favor of detention. See 18 U.S.C. § 3142(g)(1) (finding relevant "whether the offense is a crime of violence"). Furthermore, the defendant's willingness to engage with additional narcotics trafficking even now—the crack cocaine sale that led to his arrest in the Bronx two days ago—reflects continued dangerousness that warrants detention. See, e.g., United States v. Jacobson, 502 F. App'x 31, 32-33 (2d Cir. 2012) (affirming detention based on presumption and willingness to continue distributing narcotics).

The defendant's knowledge of the seriousness of the charges against him in this case also reflects his narcotics-related dangerousness and gives him a strong incentive to

---

[1] The trial record showed that co-conspirators threatened and assaulted (including Tased) non-compliant women who were directed to store the narcotics in their bodies as they transported the drugs to Maine. A defendant was convicted of arson in Maine connection with the drug trafficking scheme. In addition, juries found beyond a reasonable doubt that two trial defendants have discharged firearms in connection with the drug trafficking scheme, and that three trial defendants have possessed other firearms in connection with the scheme.

7

abscond. See United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003). He faces up to 60 years' imprisonment. See United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (noting that possibility of a "severe sentence" heightens the risk of flight).

      Moreover, the weight of evidence against the defendant is overwhelming and demonstrates his dangerousness and risk of flight. See 18 U.S.C. § 3142(g)(2). The record includes his scheme-related communications, his physical presence (confirmed by witnesses and electronic data) at the 9 Bings Stash House, jury-credited witness testimony about the scheme, and the recovery of controlled substances at the 9 Bings Stash Houses and other stash houses related to the scheme. Similar evidence was sufficient to persuade a jury to find substantially similar narcotics offenses proven as to five trial defendants and to convict them beyond a reasonable doubt.

      The defendant's fugitive status also provides powerful evidence of flight risk. See 18 U.S.C. § 3142(g)(3) (finding relevant "the person's character," length of local residence, "community ties," and "past conduct"). The defendant's decision to stop using his once-primary phone number and e-mail address, as well as his decision to use a radically different alias and date or birth, show that he learned about the unsealed federal case against him and decided not to report himself to law enforcement for nearly five years. His choice of becoming a fugitive strongly supports pretrial detention. See United States v. Shakur, 817 F.2d 189, 198-201 (2d Cir. 1987) (reversing release order in part because defendant's "flight was not some incident remote in time and unrelated to the" case, the defendant was charged with crimes of violence, and conviction is "likel[y]"); United States v. Dellacroce, 613 F. Supp. 312, 315 (E.D.N.Y. 1985) (detaining in part because the defendant "chose to become a fugitive," racketeering charges were alleged, and weight of evidence is "considerable"), aff'd sub nom. United States v. Carneglia, 795 F.2d 1005 (2d Cir. 1986) (mem.).

      In addition, as explained above, the conditions of home detention and location monitoring do not adequately protect against dangerousness and future flight. See United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) (noting that electronic monitoring devices "can be circumvented" and "rendered inoperative"); Valerio, 9 F. Supp. 3d at 298. Any promised forfeiture of the defendant's passports also does not sufficiently mitigate his risk of flight. See, e.g., United States v. Boustani, 356 F. Supp. 3d 246, 257 (E.D.N.Y. 2019), aff'd, No. 19-344, 2019 WL 2070656 (2d Cir. Mar. 7, 2019).

      Therefore, especially in light of the Bail Reform Act presumption here, the Court should detain the defendant because no set of conditions will reasonably assure his appearance at judicial proceedings.

IV.    Conclusion

For the foregoing reasons, the government respectfully submits that this Court must preside over a pretrial detention hearing and should hold the defendant without bail.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:    /s/
Lindsey R. Oken
Joy Lurinsky
Victor Zapana
Michael J. Castiglione
Assistant U.S. Attorneys
(718) 254-7000

cc:    Clerk of the Court (BMC) (by E-mail)
       Clerk of the Court (VMS) (by E-mail)
       Defense Counsel (by E-mail)